OFFICE OF THE ATTORNEY GENERAL · STATE OF TEXAS



May 8, 2002

The Honorable Bob Turner
Chairman, Committee on Public Safety
Texas House of Representatives
P.O. Box 2910
Austin, Texas 78768-2910

Opinion No. JC-0502

Re: Whether Insurance Code article 3.70-3C, section 3A(c), (i) and article 20A.18B(c), (i) authorize the Texas Commissioner of Insurance to promulgate rules requiring health maintenance organizations and preferred provider organizations to disclose their policies regarding fees, bundling, and downcoding to physicians and other health care providers (RQ-0461-JC)

Dear Representative Turner:

Article 3.70-3C, section 3A and article 20A.18B of the Insurance Code require health maintenance organizations (HMOs) and preferred provider organizations (PPOs) to promptly pay the claims of physicians and other health care providers (hereinafter "providers"). You ask whether article 3.70-3C, section 3A(c), (i) and article 20A.18B(c), (i) authorize the Texas Commissioner of Insurance (the "Commissioner") to promulgate rules requiring HMOs and PPOs to disclose their policies regarding fees, bundling, and downcoding to providers.[1] We answer your question in the affirmative and conclude that these provisions authorize the Commissioner and the Texas Department of Insurance to promulgate rules requiring HMOs and PPOs to disclose their policies regarding fees, bundling, and downcoding.

Your question requires us to examine statutory language added to the Insurance Code by the legislature in 1999. As background, we begin with a brief explanation of the terms "bundling" and "downcoding" and a description of the 1999 legislation and subsequent legal developments.

The terms "bundling" and "downcoding" refer to ways in which an HMO or a PPO may evaluate a provider's request for payment. After treating a patient who is covered by an HMO or a PPO health plan, a provider submits a claim for payment to the HMO or PPO that will include a shorthand description of the particular services or procedures performed by the provider in the form of a code. For this purpose, providers and insurers generally use uniform codes, developed by the

---

[1]Letter from Honorable Bob Turner, Chairman, House Committee on Public Safety, to Honorable John Cornyn, Texas Attorney General at 2 (Nov. 2, 2001) (on file with the Opinion Committee) [hereinafter Request Letter]. You ask about Insurance Code, article 3.70-3C, section 3A and article 20A.18B as added by Act of May 29, 1999, 76th Leg., R.S., ch. 1343, 1999 Tex. Gen. Laws 4556.

American Medical Association, that are often referred to as "Current Procedural Terminology" or "CPT" codes. *See generally* Texas Department of Insurance Brief at 3 n.2;[2] Texas Association of Health Plans Brief at 1-2;[3] Texas Medical Association Brief at 1-2.[4] "Bundling" occurs when a provider submits a claim listing multiple codes and the insurer combines two or more codes, effectively reimbursing the provider for fewer procedures than those listed on the claim. *See* TDI Brief, *supra* note 2, at 3 (defining bundling as "a practice whereby a claim submitted . . . for two or more separate and distinct CPT services or procedures . . . is 'bundled' by the carrier who reimburses for just one of the services or procedures, typically the one of the lowest cost"). "Downcoding" is a practice whereby CPT codes submitted by a provider are changed unilaterally by an HMO or a PPO from codes describing higher levels of service to codes describing lower levels of service. *See id.* at 3 n.3.

Your question about HMO and PPO disclosure of fees, bundling, and downcoding policies arises from 1999 amendments to the Insurance Code, enacted by House Bill 610. As the bill analyses explain, House Bill 610 was intended to "require[] prompt payment to physicians and providers for services performed."[5] The bill did this by requiring HMOs and PPOs to pay physicians and other providers within a time certain after the submission of a "clean claim," *see* Tex. H.B. 610, §§ 1-2, 76th Leg., R.S. (1999), Act of May 29, 1999, 76th Leg., R.S., ch. 1343, §§ 1-2, 1999 Tex. Gen. Laws 4556, 4556-59 (enacting Tex. Ins. Code art. 3.70-3C, § 3A(a), (c) and art. 20A.18B(a), (c)), which it defined as a completed claim, as determined by Texas Department of Insurance (TDI) rules, *see id.* (enacting Tex. Ins. Code art. 3.70-3C, § 3A(a) and art. 20A.18B(a)). Significantly for our purposes, House Bill 610 also required HMOs and PPOs to provide physicians and providers with "copies of all applicable utilization review policies and claim processing policies or procedures, including required data elements and claim formats" and authorized the Commissioner to adopt implementing rules. *See id.* (enacting Tex. Ins. Code art. 3.70-3C, § 3A(i), (n) and art. 20A.18B(i),(o)).

We note that in the last legislative session, the legislature enacted a bill, House Bill 1862, which the Governor subsequently vetoed, that would, among other things, have required HMOs and

---

[2]Brief from Lynda H. Nesenholtz, General Counsel, Texas Department of Insurance, to Susan Gusky, Chair, Opinion Committee, Office of Attorney General (Dec. 20, 2001) (on file with Opinion Committee) [hereinafter TDI Brief].

[3]Brief from Leah Rummel, Executive Director, Texas Association of Health Plans, to Honorable John Cornyn, Texas Attorney General (Dec. 14, 2001) (on file with Opinion Committee).

[4]Brief from Lee A. Spangler, Assistant General Counsel, Texas Medical Association, to Honorable John Cornyn, Texas Attorney General (Dec. 10, 2001) (on file with Opinion Committee) [hereinafter TMA Brief].

[5]*See* HOUSE COMM. ON INSURANCE, BILL ANALYSIS, Tex. H.B. 610, 76th Leg., R.S. (1999) (as introduced); HOUSE COMM. ON INSURANCE, BILL ANALYSIS, Tex. H.B. 610, 76th Leg., R.S. (1999) (committee substitute); SENATE COMM. ON ECONOMIC DEVELOPMENT, BILL ANALYSIS, Tex. H.B. 610, 76th Leg., R.S. (1999) (as engrossed); SENATE COMM. ON ECONOMIC DEVELOPMENT, BILL ANALYSIS, Tex. H.B. 610, 76th Leg., R.S. (1999) (committee substitute); HOUSE COMM. ON INSURANCE, BILL ANALYSIS, Tex. H.B. 610, 76th Leg., R.S. (1999) (enrolled).

PPOs to provide physicians and providers upon request with "a description of the coding guidelines, including any underlying bundling, recoding, or other payment process and fee schedules." Tex. H.B. 1862, 77th Leg., R.S. (2001); Veto Message of Gov. Perry, Tex. H.B. 1862, 77th Leg., R.S. (2001). The Governor's veto proclamation acknowledged the strain between health plans and providers over contract and payment issues and directed TDI "to be more aggressive in assisting physicians and health care providers in claims disputes" and to "quickly reopen and strengthen existing prompt pay rules." Veto Message of Gov. Perry, Tex. H.B. 1862, 77th Leg., R.S. (2001).

TDI adopted rules implementing House Bill 610 in May 2000, *see* 25 Tex. Reg. 4543 (2000), which it amended in February of 2001, *see* 26 Tex. Reg. 1341 (2001), and September 2001, *see id.* at 7542. None of these rules address disclosure of fees, bundling, or downcoding policics. *See* 28 Tex. Admin. Code §§ 21.2801-.2816 (2001) (Submission of Clean Claims). It appears, however, that several entities asked TDI in the last round of rulemaking, which ended on September 28, 2001, to address disclosure of bundling and downcoding policies. *See* 26 Tex. Reg. 7542, 7544-45 (2001). The Department declined to do so, stating:

> It is the department's position that Article 20A.18B(i) and Article 3.70-3C § 3A(i), relating to claims processing policies and procedures, do not require carriers to disclose bundling and downcoding procedures. The policies and procedures identified in these statutes are those necessary for notifying physicians and providers of the information needed to file a clean claim and when the physician or provider can expect to be paid, and do not include bundling or downcoding disclosures.

*Id.* at 7545. In essence, your letter questions TDI's construction of Insurance Code article 3.70-3C, section 3A(i) and article 20A.18B(i). Specifically, you ask:

> Does the Commissioner of Insurance have the authority under Texas state law, Insurance Code Art. 20A.18B(c) & (i) and Art. 3.70-3C Sec. 3A(c) & (i), to require a Health Maintenance Organization or a Preferred Provider Organization to disclose to a participating physician or provider that organization's claims processing policies regarding fees, bundling and downcoding, and should those policies be included in the disclosure required by Art. 20A.18B (i) and Art. 3.70-3C Sec. 3A(i)?

Request Letter, *supra* note 1, at 2. Your reference to "policies regarding fees" appears to mean fee schedules, information regarding what an HMO or a PPO will pay for particular services. *See id.* For the reasons explained below, we conclude that these provisions authorize the Commissioner and TDI to promulgate rules requiring HMOs and PPOs to disclose their policies regarding fees, bundling, and downcoding.

House Bill 610 amended two different provisions of the Insurance Code – the Health Maintenance Organization Act, chapter 20 of the Insurance Code, which governs HMOs,[6] and article 3.70-3C, which contains certain provisions applicable only to preferred provider benefit plans.[7] Because the prompt payment provisions governing HMOs and PPOs are identical, we will describe and analyze them together.

As enacted by House Bill 610, article 20A.18B and article 3.70-3C, section 3A require the prompt payment of providers by HMOs and PPOs following the receipt of a "clean claim." A "clean claim" is defined as "a completed claim, as determined under" TDI rules, submitted by a provider "for medical care or health care services" under a health care plan or health insurance policy. *See* TEX. INS. CODE ANN. art. 3.70-3C, § 3A(a); *id.* art. 20A.18B(a) (Vernon Supp. 2002). The prompt payment provisions require an HMO or a PPO "[n]ot later than the 45th day after the date that [it] receives a clean claim" from a provider to:

> (1) pay the total amount of the claim in accordance with the contract between the . . . provider and the [PPO or HMO];

> (2) pay the portion of the claim that is not in dispute and notify the . . . provider in writing why the remaining portion of the claim will not be paid; or

> (3) notify the . . . provider in writing why the claim will not be paid.

*Id.* art. 3.70-3C, § 3A(c); *id.* art. 20A.18B(c). If the PPO or HMO acknowledges coverage of an insured or enrollee under the health insurance policy or health care plan "but intends to audit the . . . provider claim, the [PPO or HMO] shall pay the charges submitted at 85 percent of the contracted rate on the claim not later than the 45th day after the date that the [PPO or HMO] receives the claim from the . . . provider." *Id.* art. 3.70-3C, § 3A(e); *id.* art. 20A.18B(e).

---

[6] The Health Maintenance Organization Act defines an HMO as "any person who arranges for or provides a health care plan, a limited health care service plan, or a single health care service plan to enrollees on a prepaid basis." TEX. INS. CODE ANN. art. 20A.02(n) (Vernon Supp. 2002). A "health maintenance organization delivery network" is "a health care delivery system in which a health maintenance organization arranges for health care services directly or indirectly through contracts and subcontracts with providers and physicians." *Id.* art. 20A.02(w).

[7] Under article 3.70-3C, a "preferred provider" is "a physician, practitioner, hospital, institutional provider, or health care provider, or an organization of physicians or health care providers, who contracts with an insurer to provide medical care or health care to insureds covered by a health insurance policy, certificate, or contract." TEX. INS. CODE ANN. art. 3.70-3C, § 1(10) (Vernon Supp. 2002). Article 3.70-3C applies to "any preferred provider benefit plan in which an insurer provides, through its health insurance policy, for the payment of a level of coverage which is different from the basic level of coverage provided by the health insurance policy if the insured uses a preferred provider." *Id.* § 2 ("This article does not apply to provisions for dental care benefits in any health insurance policy.").

A PPO or an HMO that fails to pay a provider in accordance with these requirements "is liable to a . . . provider for the full amount of billed charges submitted on the claim or the amount payable under the contracted penalty rate, less any amount previously paid or any charge for a service that is not covered by" the health insurance policy or health care plan, *id.* art. 3.70-3C, § 3A(f); *id.* art. 20A.18B(f), and "is subject to an administrative penalty under Article 1.10E" of the Insurance Code, *id.* art. 3.70-3C, § 3A(h); *id.* art. 20A.18B(h). "The administrative penalty imposed under that article may not exceed $1,000 for each day the claim remains unpaid in violation of Subsection (c) or (e) of this section." *Id.* art. 3.70-3C, § 3A(h); *id.* art. 20A.18B(h).

The prompt payment provisions also require a PPO or an HMO to "provide a . . . provider with copies of all applicable utilization review policies and claim processing policies or procedures, including required data elements and claim formats." *Id.* art. 3.70-3C, § 3A(i); *id.* art. 20A.18B(i). A PPO or an HMO "may, by contract with a . . . provider, add or change the data elements that must be submitted with the . . . provider claim." *Id.* art. 3.70-3C, § 3A(j); *id.* art. 20A.18B(j). "Not later than the 60th day before the date of an addition or change in the data elements that must be submitted with a claim or any other change" in a PPO or an HMO's "claim processing and payment procedures," the PPO or HMO "shall provide written notice of the addition or change to each . . . provider." *Id.* art. 3.70-3C, § 3A(k); *id.* art. 20A.18B(k). Finally, both prompt payment provisions provide that the Commissioner may adopt necessary implementing rules. *See id.* art. 3.70-3C, § 3A(n) ("The commissioner of insurance may adopt rules as necessary to implement this section."); *id.* art. 20A.18B(o) ("The commissioner may adopt rules as necessary to implement this section.").

In its rules, TDI has construed the requirement that a PPO or an HMO "provide a . . . provider with copies of all applicable utilization review policies and claim processing policies or procedures, including required data elements and claim formats," *id.* art. 3.70-3C, § 3A(i); *id.* art. 20A.18B(i), to require a PPO or an HMO to disclose "claims processing policies and procedures . . . which are necessary to submit a claim that is clean for prompt payment," TDI Brief, *supra* note 2, at 4, including, for example, policies specifying which claim form, attachments, and other information must be submitted, when and where a claim must be submitted, and whether a claim must be submitted by mail, e-mail, or facsimile, *see id.* at 4-5; *see also* 28 TEX. ADMIN. CODE §§ 21.2802(4) (2001) (defining clean claim), .2803(b) (required data elements), (c) (necessary attachments). TDI takes the position that the language mandating disclosure of "claim processing policies or procedures" requires PPOs and HMOs to disclose only information relevant to what makes a claim complete. It asserts that bundling and downcoding policies do not fall within the scope of the information that must be disclosed because such policies "provide a means by which a claim is valued under the terms of the contract between the carrier and the provider" and do not pertain to whether a claim is clean. TDI Brief, *supra* note 2, at 5. The Texas Medical Association, on the other hand, contends that the prompt payment provisions not only require PPOs and HMOs to pay providers promptly, but to pay them correctly, and asserts that the disclosure requirements must be construed in light of that goal: "[T]he legislature passed an Act that is intended to facilitate payment to physicians and provide physicians with the policies and procedures information they need to determine they have been paid correctly." TMA Brief, *supra* note 4, at 3.

When construing a statute, we must attempt to give effect to the legislature's intent. *See* TEX. GOV'T CODE ANN. §§ 311.021, .023 (Vernon 1998); *Mitchell Energy Corp. v. Ashworth*, 943 S.W.2d 436, 438 (Tex. 1997). To give effect to legislative intent, we construe a statute according to its plain language. *See RepublicBank Dallas, N.A. v. Interkal, Inc.*, 691 S.W.2d 605, 607-08 (Tex. 1985); *Bouldin v. Bexar County Sheriff's Civil Serv. Comm'n*, 12 S.W.3d 527, 529 (Tex. App.–San Antonio 1999, no pet.). When interpreting a statute, words and phrases that have acquired a technical or particular meaning, by legislative definition or otherwise, must be construed accordingly. *See* TEX. GOV'T CODE ANN. § 311.011(b) (Vernon 1998). Otherwise, words and phrases shall be read in context and construed according to the rules of grammar and common usage. *Id.* § 311.011(a). When a statute does not define a term, we apply the term's ordinary meaning. *See Hopkins v. Spring Indep. Sch. Dist.*, 736 S.W.2d 617, 619 (Tex. 1987).

The specific statutory language at issue requires PPOs and HMOs to disclose "copies of all applicable utilization review policies and claim processing policies or procedures, including required data elements and claim formats." TEX. INS. CODE ANN. art. 3.70-3C, § 3A(i); *id.* art. 20A.18B(i) (Vernon Supp. 2002). The legislature did not define the terms "utilization review policies," "claim processing policies or procedures," "data elements," and "claim formats" anywhere in the prompt payment provisions. Article 21.58A of the Insurance Code, which governs health care utilization review agents, defines "utilization review" as "a system for prospective or concurrent review of the medical necessity and appropriateness of health care services being provided or proposed to be provided to an individual within this state. Utilization review shall not include elective requests for clarification of coverage." *Id.* art. 21.58A, § 2(20). It is not clear to us that fee schedules or bundling or downcoding policies, which pertain to how providers are compensated for services performed, are policies regarding "prospective or concurrent review of the medical necessity and appropriateness of health care services being provided or proposed to be provided" to a patient. *Id.* None of the other terms are defined by statute and we are not aware of any technical or commonly understood meaning of those terms. *See* TEX. GOV'T CODE ANN. § 311.011 (Vernon 1998) (words and phrases that have acquired a technical or particular meaning, by legislative definition or otherwise, must be construed accordingly; otherwise, words and phrases shall be read in context and construed according to the rules of grammar and common usage).

The prompt payment provisions as a whole are ambiguous with respect to whether fee schedules and bundling and downcoding policies must be disclosed. Looking at the disclosure requirements in the context of the prompt payment provisions in their entirety, it is clear from the plain language that the statutes' purpose is to establish a mechanism for prompt payment of providers' claims. They do this by establishing a time limit within which a PPO or an HMO must pay a provider's claim. This time limit is triggered by the submission of a "clean" or "complete" claim. Viewed in this light, the disclosure provisions, which require a PPO or an HMO to provide a "provider with copies of all applicable utilization review policies and claim processing policies or procedures, including required data elements and claim formats," TEX. INS. CODE ANN. art. 3.70-3C, § 3A(i); *id.* art. 20A.18B(i) (Vernon Supp. 2002), are clearly intended, at a minimum, to ensure that providers will have the information necessary to determine that a claim is complete before submitting it. It is not clear from the plain language of the statute, however, whether disclosure of

fee schedules and bundling and downcoding policies is necessary to the submission of a clean claim or whether the disclosure provisions have a broader purpose.

When a statute is ambiguous, we may consider, among other things, the object sought to be attained, the circumstances under which a statute was enacted, legislative history, the consequences of a particular construction, and administrative construction of the statute. *See* TEX. GOV'T CODE ANN. § 311.023 (Vernon 1998); *see also id.* § 311.021 (in enacting a statute, it is presumed that "a just and reasonable result is intended" and "a result feasible of execution is intended"). In particular, courts will defer to the construction of a statute by the administrative agency charged with its enforcement, so long as the construction is reasonable and does not contradict the plain language of the statute. *See Tarrant Appraisal Dist. v. Moore*, 845 S.W.2d 820, 823 (Tex. 1993); *Tex. Utils. Elec. Co. v. Sharp*, 962 S.W.2d 723, 726 (Tex. App.–Austin 1998, pet. denied). This is particularly true where the statute is ambiguous due to the complexity of the subject matter. *See Tex. Ass'n of Long Distance Tel. Cos. v. Pub. Util. Comm'n*, 798 S.W.2d 875, 884 (Tex. App.–Austin 1990, writ denied).

We have reviewed the bill analyses, the committee hearings, and the floor debates pertaining to House Bill 610,[8] none of which specifically address fee schedules or bundling or downcoding policies or the disclosure of such information. The bill analyses, for example, reiterate that, in enacting House Bill 610, the legislature intended to establish a prompt payment mechanism:

> Currently, [HMOs] are not required to compensate physicians for services within a specified period of time. H.B. 610 requires prompt payment to physicians and providers for services performed. This bill sets further payment schedules for physicians and provides penalties for late payments.

HOUSE COMM. ON INSURANCE, BILL ANALYSIS, Tex. H.B. 610, 76th Leg., R.S. (1999) (as introduced) (Background and Purpose).[9] In explaining the purpose of House Bill 610 to the House

---

[8] *See* HOUSE COMM. ON INSURANCE, BILL ANALYSIS, Tex. H.B. 610, 76th Leg., R.S. (1999) (as introduced); HOUSE COMM. ON INSURANCE, BILL ANALYSIS, Tex. H.B. 610, 76th Leg., R.S. (1999) (committee substitute); SENATE COMM. ON ECONOMIC DEVELOPMENT, BILL ANALYSIS, Tex. H.B. 610, 76th Leg., R.S. (1999) (as engrossed); SENATE COMM. ON ECONOMIC DEVELOPMENT, BILL ANALYSIS, Tex. H.B. 610, 76th Leg., R.S. (1999) (committee substitute); HOUSE COMM. ON INSURANCE, BILL ANALYSIS, Tex. H.B. 610, 76th Leg., R.S. (1999) (enrolled); *Hearings on Tex. H.B. 610 Before the House Comm. on Insurance*, 76th Leg., R.S. (Mar. 30, 1999) (tape available from House Video/Audio Services); *Hearings on Tex. H.B. 610 Before the Senate Comm. on Economic Development*, 76th Leg., R.S. (May 11, 1999) (tape available from Senate Staff Services Office); Debate on Tex. H.B. 610 on the Floor of the House, 76th Leg., R.S. (May 4, 1999) (2d & 3d Reading) (tape available from House Video/Audio Services); Debate on Tex. H.B. 610 on the Floor of the Senate, 76th Leg., R.S. (May 18, 1999) (2d & 3d Reading) (tape available from Senate Staff Services Office).

[9] *See also* HOUSE COMM. ON INSURANCE, BILL ANALYSIS, Tex. H.B. 610, 76th Leg., R.S. (1999) (committee substitute); SENATE COMM. ON ECONOMIC DEVELOPMENT, BILL ANALYSIS, Tex. H.B. 610, 76th Leg., R.S. (1999) (as engrossed); SENATE COMM. ON ECONOMIC DEVELOPMENT, BILL ANALYSIS, Tex. H.B. 610, 76th Leg., R.S. (1999)

(continued...)

Committee on Insurance, the bill's author indicated that PPOs and HMOs might be intentionally delaying payments to providers: "[I]nsurance companies, HMOs, PPOs will drag out the payment process and, in doing so, they're able to sit on large sums of money . . . while they earn interest on that."[10] Clearly, the legislative goal was to ensure that PPOs and HMOs would not delay paying providers' claims. But there is no indication that the legislature specifically considered whether or not PPOs and HMOs should be required to disclose to providers their fee schedules or bundling and downcoding policies.

It is clear from the legislative history, however, that the legislature intended to rely on TDI to work out the technical details. *See, e.g., supra* note 10 (Janek testimony noting that TDI was already in the process of working on a regulatory definition of a clean claim and stating that the bill "will put the definition of 'clean claim' back to TDI. I don't want to get into defining it in the bill only to have something substantially different than what TDI would propose."). Moreover, in enacting the statute, the legislature specifically charged TDI with enforcing the prompt payment provisions, with defining a clean claim, and with promulgating implementing rules. *See* TEX. INS. CODE ANN. art. 3.70-3C, § 3A(a), (h), (n) (Vernon Supp. 2002) ("The commissioner of insurance may adopt rules as necessary to implement this section."); *id.* art. 20A.18B(a), (h), (o) ("The commissioner may adopt rules as necessary to implement this section."). Given the statute's ambiguity with respect to the scope of required disclosures, the lack of conclusive legislative history, and the overall complexity of this regulatory area, we believe that a court, recognizing the agency's expertise in the field, would defer to TDI's construction of the prompt payment provisions' disclosure requirements.

As noted above, TDI has concluded that the prompt payment provisions do not require HMOs and PPOs to disclose their fee schedules and bundling and downcoding policies, based upon its determination that the purpose of the language mandating disclosure of "claim processing policies or procedures" is limited to making available information that will allow providers to submit clean claims and its assessment that disclosure of fee schedules and bundling and downcoding information is not necessary to the preparation of a clean claim. We believe that a court would find this construction of the statute does not conflict with the statute's plain language and is reasonable. As we explain below, however, we also believe that a court would find reasonable an alternate TDI construction of the prompt payment provisions to require disclosure of fee schedules and bundling and downcoding policies.

First, the prompt payment provisions' disclosure requirements mandate the disclosure of "copies of all applicable utilization review policies and claim processing policies or procedures, *including* required data elements and claim formats." TEX. INS. CODE ANN. art. 3.70-3C, § 3A(i);

---

[9](...continued)
(committee substitute); HOUSE COMM. ON INSURANCE, BILL ANALYSIS, Tex. H.B. 610, 76th Leg., R.S. (1999) (enrolled).

[10]*Hearings on Tex. H.B. 610 Before the House Comm. on Insurance*, 76th Leg., R.S. (Mar. 30, 1999) (testimony of Representative Janek) (tape available from House Video/Audio Services).

*id*. art. 20A.18B(i) (Vernon Supp. 2002) (emphasis added). As noted above, the legislature did not define the terms "utilization review policies," "claim processing policies or procedures," "data elements," and "claim formats" anywhere in the prompt payment provisions. Under its rulemaking authority, TDI has the authority to define these terms as necessary to implement the prompt payment provisions. *See id*. art. 3.70-3C, § 3A(a), (h), (n) ("The commissioner of insurance may adopt rules as necessary to implement this section."); *id*. art. 20A.18B(a), (h), (o) ("The commissioner may adopt rules as necessary to implement this section."). Furthermore, the word "include" is a "term of enlargement" that does not limit a set to listed items; a statute's "usc of the term[] does not create a presumption that components not expressed are excluded." TEX. GOV'T CODE ANN. § 311.005(13) (Vernon 1998); *see also* BRYAN A. GARNER, A DICTIONARY OF MODERN LEGAL USAGE 287 (1987) (discussing "include"); BLACK'S LAW DICTIONARY 766 (7th ed. 1999) (defining "include"). The term "include" signifies an "illustrative" list. BRYAN A. GARNER, A DICTIONARY OF MODERN LEGAL USAGE 287 (1987) (quoting *Puerto Rico Maritime Shipping Auth. v. I.C.C.*, 645 F.2d 1102, 1112 n.26 (D.C. Cir. 1981)). Thus, it is within TDI's authority to determine that fee schedules and bundling and downcoding policies are similar to "data elements" or "claim formats." Were TDI to conclude that fee schedules and bundling and downcoding policies constitute "utilization review policies," "claim processing policies or procedures," "data elements," or "claim formats,"or are sufficiently like "data elements" or "claim formats," we believe that a court would defer to its expertise in this matter. *See* TEX. GOV'T CODE ANN. § 311.011(b) (Vernon 1998) (words and phrases that have acquired a technical or particular meaning, by legislative definition or otherwise, must be construed accordingly).

Second, the plain language of the prompt payment provisions as a whole does not foreclose such a construction of the disclosure provisions. As the Texas Medical Association points out, the prompt payment provisions require PPOs and HMOs upon receiving a clean claim to "pay the total amount of the claim *in accordance with the contract*." TEX. INS. CODE ANN. art. 3.70-3C, § 3A(c)(1); *id*. art. 20A.18B(c)(1) (Vernon Supp. 2002) (emphasis added). And, if the PPO or HMO acknowledges coverage of an insured or enrollee under the health insurance policy or health care plan "but intends to audit the . . . provider claim, the [PPO or HMO] shall pay the charges submitted at 85 percent *of the contracted rate* on the claim not later than the 45th day after the date that the [PPO or HMO] receives the claim from the . . . provider." *Id*. art. 3.70-3C, § 3A(e); *id*. art. 20A.18B(e) (emphasis added). The Texas Medical Association argues that "without a copy of the fee schedule, bundling logic, or downcoding policies, there is no way for a physician to determine whether he has been paid according to contract." TMA Brief, *supra* note 4, at 3. Based on this statutory language, we believe that TDI could reasonably construc the prompt payment provisions' disclosure requirements more broadly to require PPOs and HMOs to disclose information that would provide physicians with a basis for determining whether they have been paid according to the contract, including fee, bundling, and downcoding information. Were TDI to construe the disclosure provisions in this manner, we do not believe a court would conclude that the agency had exceeded its statutory authority, which is quite broad. TDI is charged with adopting rules necessary to implement the prompt payment provisions as a whole; its rulemaking authority is not limited to defining the meaning of a clean claim or to construing the disclosure requirements. *See* TEX. INS. CODE ANN. art. 3.70-3C, § 3A(n) (Vernon Supp. 2002) ("The commissioner of insurance may adopt

rules as necessary to implement this section."); *id.* art. 20A.18B(o) ("The commissioner may adopt rules as necessary to implement this section.").

Finally, in its brief, TDI suggests that any construction of the prompt payment provisions to require disclosure of fee schedules and bundling and downcoding policies is foreclosed by Senate Bill 781, also enacted by the Seventy-sixth Legislature that enacted House Bill 610, and House Bill 1862, enacted by the Seventy-seventh Legislature and subsequently vetoed by the Governor. We disagree.

Senate Bill 781 amended article 3.70-3C and chapter 20A of the Insurance Code, the same provisions amended by House Bill 610, adding provisions mandating special contractual rights for podiatrists providing services under HMO and PPO plans:

> *A preferred provider contract* between an insurer and a podiatrist licensed by the Texas State Board of Podiatric Medical Examiners *must provide that*:
>
> > (1) *the podiatrist may request, and the insurer shall provide* not later than the 30th day after the date of the request, *a copy of the coding guidelines and payment schedules applicable to the compensation that the podiatrist will receive under the contract for services*;
> >
> > (2) the insurer may not unilaterally make material retroactive revisions to the coding guidelines and payment schedules;
>
> > . . . .

TEX. INS. CODE ANN. art. 3.70-3C, § 3(n)(1)-(2) (Vernon Supp. 2002) (emphasis added), *as amended by* Tex. S.B. 781, 76th Leg., R.S. (1999).

> *A contract* between a health maintenance organization and a podiatrist licensed by the Texas State Board of Podiatric Medical Examiners *must provide that*:
>
> > (1) *the podiatrist may request, and the insurer shall provide* not later than the 30th day after the date of the request, *a copy of the coding guidelines and payment schedules applicable to the compensation that the podiatrist will receive under the contract for services*;

> (2) the insurer may not unilaterally make material retroactive revisions to the coding guidelines and payment schedules;

> . . . .

*Id.* art. 20A.18A(j)(1)-(2) (emphasis added), *as amended by* Tex. S.B. 781, 76th Leg., R.S. (1999). The introduced version of Senate Bill 781 extended this contractual right to all providers, but the senate committee substitute version of the bill limited its scope to podiatrists. *Compare* Tex. S.B. 781, 76th Leg., R.S. (1999) (as introduced) (PPO or HMO contract with provider "must include a complete fee schedule, all applicable treatment codes, and a complete explanation of the method of determining payment to the . . . provider") *with* Tex. S.B. 781, 76th Leg., R.S. (1999) (Senate committee substitute) ("contract between [a PPO or an HMO] and a podiatrist . . . must provide that . . . the podiatrist may request, and the insurer shall provide . . . a copy of the coding guidelines and payment schedules applicable to the compensation that the podiatrist will receive under the contract for services").

Similarly, House Bill 1862 would have mandated a right of access to information as a contract term between an HMO or a PPO and a provider. Specifically, it would have required that contracts permit physicians and other providers to request "a description of coding guidelines, including any underlying bundling, recoding, or other payment process and fee schedules applicable to specific procedures that the physician or provider will receive under the contract." Tex. H.B. 1862, 77th Leg., R.S. (2001). Under the mandatory contract term, the HMO or PPO would have been required to provide the information within 30 days.

TDI asserts that the amendment of Senate Bill 781 to exclude all providers except podiatrists "indicates that the Legislature specifically elected to limit access to payment methodology information only to this type of provider. Its failure to include this provision in HB 610 further indicates no intention that payment methodology be considered information relevant to prompt payment of claims." TDI Brief, *supra* note 2, at 7. And it argues that House Bill 1862 "indicates a cognizance [on the part of the Seventy-seventh Legislature] that HB 610 did not require carriers to provide this information as part of the prompt pay requirements." *Id.* at 8.

We conclude, however, that the legislature's adoption of a right to request and receive coding and fee schedule information as a mandatory contract term does not establish that the legislature intended to exclude fee schedules and bundling and downcoding policies from the scope of information that must be automatically disclosed under the prompt payment provisions. In Senate Bill 781, the Seventy-sixth Legislature adopted a mandatory contract term for podiatrists, requiring HMOs and PPOs upon request to disclose to a podiatrist coding guidelines and payment schedules applicable to the compensation that the podiatrist will receive under a contract for services. House Bill 1862 would have required a similar contract term for all providers. The prompt payment provisions, on the other hand, require automatic disclosure of certain information by HMOs and PPOs to all providers by statute, rather than pursuant to contract. The scope and existence of a right

to information pursuant to contract does not definitively establish the legislature's intent with respect to the scope of the prompt payment provisions' disclosure requirements.

In conclusion, to answer your specific question, we believe that it is within TDI's authority to construe the prompt payment provisions requiring PPOs and HMOs to disclose to physicians and other health care providers "copies of all applicable utilization review policies and claim processing policies or procedures, including required data elements and claim formats," TEX. INS. CODE ANN. art. 3.70-3C, § 3A(i); *id.* art. 20A.18B(i) (Vernon Supp. 2002), to require disclosure of fee schedules and bundling and downcoding policies.

## S U M M A R Y

Under the prompt payment provisions requiring preferred provider organizations (PPOs) and health maintenance organizations (HMOs) to disclose to physicians and other health care providers "copies of all applicable utilization review policies and claim processing policies or procedures, including required data elements and claim formats," TEX. INS. CODE ANN. art. 3.70-3C, § 3A(i); *id.* art. 20A.18B(i) (Vernon Supp. 2002), the Texas Department of Insurance is authorized to promulgate rules to require PPOs and HMOs to disclose their fee schedules and bundling and downcoding policies.

Yours very truly,

JOHN CORNYN
Attorney General of Texas

HOWARD G. BALDWIN, JR.
First Assistant Attorney General

NANCY FULLER
Deputy Attorney General - General Counsel

SUSAN DENMON GUSKY
Chair, Opinion Committee

Mary R. Crouter
Assistant Attorney General, Opinion Committee